UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAM ANTHONY TOCCO,

       Plaintiff,

v.

RICHMAN GREER PROFESSIONAL
ASSOCIATION and JOHN R. WHITTLES,

       Defendants.

_____/

Case No. 11-10310

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [47]**

From 1998 through 2008, Plaintiff Sam Tocco gave millions of dollars to Joseph Zada, either as loans or for investments, and it is undisputed that Zada still owes Tocco approximately $5 million.  (Defs.' Exs. 13, Pl.'s Ans. to Interrog. No. 2; Ex. 33, Prom. Notes and Debt Acknowledgment Form.)  It is also undisputed that some of the money that Tocco gave to Zada for investments was money Tocco had borrowed from his friends and family, including his mother, father, grandfather and 82-year-old grandmother.  Tocco's friends and family loaned him the money without the benefit of written agreements and based solely on their trust in Tocco's promise to repay the money.  (Defs.'s Ex. 11, Tocco Dep. at 59-64, 67-72.)

Tocco is not the only individual who loaned money to or invested money with Zada that has not been repaid.  *See Fedorov v. Zada, et al.*, Wayne County Circuit Court Case No. 09-018061-CB (state court action brought by hockey player and former Red Wing

Sergei Fedorov in 2009 against Zada and various Zada entities alleging that Zada owed Fedorov over $60 million where default judgment was entered against Zada and the Zada entities on August 28, 2009, and where a receiver was appointed on August 21, 2009 to assist the court in identifying Zada assets, including the whereabouts of over $100 million in unaccounted for funds) (Defs.' Ex. 36, 8/28/09 Def. Judg.; Defs.' Ex. 38, 12/22/11 Receiver's 6th Interim Status Report).  *See also United States Securities and Exchange Commission v. Joseph Zada and Zada Enterprises, LLC*, U.S. Dist. Ct., E.D. Mich., Case No. 10-14498 (federal court civil action brought by the SEC in 2010 alleging that Zada sold securities to investors in the form of promissory notes from at least January 2006 through August 2009; that Zada operated a Ponzi scheme by misappropriating for his own personal use at least $27.5 million raised from at least 60 investors; that Zada's Ponzi scheme began to unravel in 2007 when he stopped sending some investors their "interest" payments and did not return "principal" when requested by other investors; Zada told some investors that they would soon be paid back because he was the illegitimate son of a recently deceased Saudi Arabian oil sheik and was going to receive an inheritance of $600 million; beginning in 2007, Zada and Zada Enterprises signed "Satisfaction of Debt and Release" agreements with several investors that promised payment within a short period but payment was not timely made as promised; during 2008 and 2009, Zada sent checks to certain investors with an attached letter instructing the investor not to deposit the checks until he gave his authorization but never gave his authorization and, if deposited anyway, they were returned for insufficient funds; beginning in 2009, Zada also signed agreements with some investors entitled "Payment, Release, Standstill, and Confidentiality Agreement" where Zada promised to pay a lump sum by a certain date and where Zada consented to

2

the immediate entry of a judgment in favor of the investor if he failed to make the promised payment; that Zada failed to make the promised payments; and that Zada violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, 15 U.S.C, §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5) (Defs.' Ex. 12, 11/10/10 SEC Compl.).

Similar to the facts alleged in the SEC complaint against Zada, the evidence presented in this case shows that Tocco obtained a judgment against Zada in July 2009 after entering into a Payment, Release, Standstill, and Confidentiality Agreement in March 2009.

On March 5, 2009, Plaintiff Tocco, Zada, and Tocco's attorneys, Morganroth & Morganroth, PLLC, executed a Payment, Release, Standstill and Confidentiality Agreement providing that, if Zada did not pay Tocco $4,797,541.00 within 45 days, then he consented "to the immediate entry of a judgment in favor of Tocco against him and/or the Zada Entities . . . in the customary form of a consent judgment in the amount of $4,797,541.00, such judgment to be placed in escrow with Tocco's attorneys, Morganroth & Morganroth, PLLC, as escrow agent, upon execution of this Agreement, . . . and only entered in the event" that Zada failed to pay $4,797,541.00 to Tocco within 45 days.  (Defs.' Ex. 40, 3/5/09 Agree.)  It is undisputed that Zada did not pay as required within 45 days.  Tocco's attorneys, Morganroth & Morganroth, however, waited until July 28, 2009 to file a complaint against Zada in Wayne County Circuit Court and to enter the Consent Judgment against Joseph Zada.  (Defs.' Ex. 41, 7/28/09 Consent Judg.; Defs.' Ex. 5, Morganroth Dep. at 37-38).   Other than learning that a receiver had been appointed in the Fedorov litigation

against Zada, Tocco's attorneys, Morganroth & Morganroth, made no attempt to execute on Tocco's judgment against Zada.  (Morganroth Dep. at 39.)

On January 4, 2011, Tocco filed this lawsuit in state court against Zada's former Florida counsel, Defendants Richman Greer Professional Association ("Defendant Firm") and John R. Whittles ("Defendant Attorney").  Defendant Attorney's representation of Zada regarding the Tocco debt began in January 2008 and ended before the March 5, 2009 agreement was executed.  Defendants officially withdrew from all representation of Zada in November 2009 for nonpayment of about $505,000.00 in attorney fees.  (Defs.' Ex. 1, Whittles Dep. at 16-21, 91-99, 102-104, 306-307.)

Plaintiff's complaint alleges three state-law claims:  fraudulent, negligent, and innocent misrepresentation, all in connection with Defendants' attempts to facilitate their client Zada's efforts to repay the $4,797,541.00 Zada has admitted he owes to Tocco.  At the December 12, 2012 hearing on Defendants' motion for summary judgment, Plaintiff confirmed that he was also asserting a claim of silent fraud.  Plaintiff seeks $14 million in compensatory damages, and $25,000 in consequential damages.  (Compl. at 16.)  Defendants subsequently removed the matter here, asserting diversity jurisdiction.  This matter is presently before the Court on Defendants' motion for summary judgment.

For the reasons stated below, Defendants' motion is GRANTED.  Plaintiff's fraudulent misrepresentation claim fails because, viewing the evidence in the light most favorable to him, there is no question that he cannot show that he reasonably relied to his detriment on a false factual representation made by Defendant Firm or Defendant Whittles.  Plaintiff's remaining claims likewise fail.  His negligent misrepresentation claim fails because he cannot establish that Defendants owed him a duty, his innocent misrepresentation claim

4

fails because he cannot establish that an alleged misrepresentation was made in connection with the making of a contract or an injury to him that inured to Defendants' benefit, and his silent fraud claim fails because he cannot establish that Defendants owed him a duty of disclosure or that Defendants intentionally failed to disclose known facts so as to mislead Plaintiff.

## I.   Facts

### A. 1998 - Tocco Meets Zada and Starts Giving Him Money

Tocco first met Zada in 1998 at Zada's Grosse Pointe home to discuss overseas investment opportunities, i.e., in currency and oil ventures.  Tocco did not ask Zada if he was licensed to securities or investment products, but did have an attorney do some background checking on Zada that showed he held significant assets in his name.  (Tocco Dep. at 7-9.)  Tocco believed that Zada was a successful investor because he had apparent wealth, i.e., he owned expensive homes in Grosse Pointe, Michigan and Florida, owned horses, drove expensive cars, displayed expensive jewelry, and enjoyed a very wealthy, comfortable life.  When Tocco asked Zada where he got his money, he explained that he befriended a wealthy family that gave him a horse that he sold for a huge profit that he successfully invested and that he had a large inheritance expectancy from which he occasionally obtained advances.   (Tocco Dep. at 9-10, 77-79.)

Tocco testified that, from at least 2000 through 2008, Tocco gave Zada over $7.5 million, some were loans with an interest rate of seven percent but most were investments with a guaranteed return of at least seven percent.  Tocco estimates that he got about $2.5 million back, but Zada still owes him about $5 million.  (Defs.' Ex. 11, Tocco Dep. at 14-18.) In his interrogatory answers, Tocco listed $6,641,251.00 in unsecured personal loans

5

provided to Zada during this time period, including $857,000.00 that he loaned to Zada on or after April 21, 2008. (Defs.' Ex. 13, Interrog. Ans. 2; Tocco Dep. at 98-99.) Additional evidence, however, shows that Tocco loaned Zada additional money, including $150,000 in January 1998 (Zada/Tocco Promissory Note), $530,000 on June 24, 2000 (Zada/Tocco Debt Acknowl. Form), $2.8 million on June 27, 2003 (Zada/Tocco Promissory Note), and $600,000 on July 7, 2004 (Zada/Tocco Promissory Note). (Defs.' Ex. 33; Tocco Dep. at 130-140.)

**B. Late 2007 - Tocco Considers Suit Against Zada, Attorney Simjanovski Begins Representation of Tocco in Connection with Repayment of Zada Debt and Files UCC Financing Statement to Secure Zada/Tocco Debt**

In late 2007 or early March 2008, Zada told Tocco that he would not be able to repay Tocco what he owed him until he received the inheritance he was expecting from a deceased member of the Saudi royal family. (Tocco Dep. at 150.) Tocco still believed Zada's promise that he would repay him because Zada had shown him an Arabic document that Zada claimed was proof of his inheritance expectancy in a Saudi estate and bank statements that confirmed Zada's ability to repay his debt to Tocco. (Tocco Dep. at 20-21, 24-27, 239-240.) Tocco testified that he did not stop believing Zada's promises of imminent repayment until January 4, 2011 when he filed this lawsuit. (Tocco Dep. at 45.)

In late 2007 or early March 2008, although Tocco was still in constant communication with Zada, Tocco had some concern about Zada's ability to repay him, considered filing a lawsuit against Zada, and conferred with Michigan and Florida legal counsel about doing so. (Tocco Dep. at 24-27, 96-98.)

6

In late 2007, Michigan attorney Daniel Simjanovski was already representing Tocco in several cases where Tocco owed money to other people. During late 2007, Tocco began consulting with attorney Simjanovski about the debt Zada owed Tocco. (Defs.' Ex. 15, Simjanovski Dep. at 14-18, 67-68; Tocco Dep. at 228-229.) Tocco wanted to collect the money Zada owed him so he could pay off people he owed. (Tocco Dep. at 229.)

At that time, Attorney Simjanovski was not concerned about Zada's ability to repay the debt he owed Tocco. As soon as attorney Simjanovski learned about Zada's debt to Tocco, he heard from five or six attorneys (other than Defendants) who represented Zada that Zada had a large, hundred million dollar inheritance expectancy and, if attorney Simjanovski and his client were patient, Tocco would get his money. He heard the same thing from legal counsel for Zada's other creditors, and attorney Simjanovski passed this information along to his client, Tocco. Other facts convinced him that Zada was collectible. At various times when Tocco needed $25,000, $50,000, or $100,000 to pay off litigants in matters Simjanovski was handling for Tocco, Zada would either provide the money directly or through Tocco. He also had done some investigation of Zada that revealed that he owned two large homes in Grosse Pointe, Michigan, was employing off-duty police as private security, and had a large million dollar home in a residential horse community in Florida. (Simjanovski Dep. at 68, 72, 91-93,101-103.)

Nonetheless, in the fall of 2007, attorney Simjanovski grew tired of the empty promises he kept hearing from Zada's numerous attorneys, including the Hyman and Lippitt law firm, that Zada would soon receive his Saudi inheritance expectancy that would allow him to repay his debt to Tocco. Attorney Simjanovski had also learned about other litigation against Zada, i.e., Peoples State Bank. So, to protect his client's interests, attorney

7

Simjanovski sought to collateralize the debt Tocco claimed Zada owed him at that time by filing a UCC Financing Statement.  (Simjanovski Dep. 36, 85-92, 97-99.)

On October 23, 2007, attorney Simjanovski filed a UCC Financing Statement in Michigan that he had prepared listing Zada and a Zada entity as debtors, a Tocco entity as the secured party, and items valuing about $2 million that served as collateral to the debt Zada owed Tocco.  The UCC Financing Statement provided that (1) the Zada debtors pledge as security "all artwork, furniture, antiques and collectibles currently owned or to be purchased in the future by either debtor, which may be located in Michigan and Florida," (2) the listed assets are located in Debtors' residences or in various yet-to-be-identified storage units, and (3) the assets were more specifically described in an attachment to an October 10, 2007 security agreement and financing statement in favor of the above-named secured party.  (Defs.' Ex. 37, 10/23/07 UCC Fin. Stmt.; Simjanovski Dep. at 73-75, 86-87; Tocco Dep. at 230.)  Attorney Simjanovski was told that there was no prior lien on the personal property listed as collateral.  (Simjanovski Dep. at 99-101.)

Tocco asked attorney Simjanovski about possibly suing Zada.  Attorney Simjanovski advised that Tocco sue Zada, but Tocco ignored his advice.  (Simjanovski Dep. at 25, 27, 96.)  Despite his concerns about not getting paid, Tocco decided not to sue Zada at that time because he trusted Zada and believed his promises that payment was forthcoming. (Tocco Dep. at 23-27; Simjanovski Dep. at 19.)

### B. Early 2008 - Tocco Consults With Florida Attorney Gary Dunkle About Zada Debt

In early 2008, Tocco also consulted with Florida attorney Gary Dunkle about suing Zada.  (Tocco Dep. at 54-56, 96-98.)  He also consulted with attorney Gary Dunkle for a

8

few weeks about drafting a Security Agreement that Zada was willing to enter into to secure the debt Zada owed Tocco. The agreement was never prepared and Tocco never filed suit against Zada because Tocco believed Zada's promises, conveyed both by Zada directly and through Zada's counsel Whittles, that the money would soon be repaid and believed Zada's representation, conveyed both by Zada directly and through Zada's counsel Whittles, that if Tocco filed suit against Zada, Zada would not get his expected Saudi inheritance. (Tocco Dep. at 241-46.)

### C.  January 2008 - Zada Employs Defendants to Settle Outstanding Debts, Including Zada/Tocco Debt

In January 2008, Zada hired Defendant Firm to coordinate the orderly repayment and settlement of a large number of his undisputed debts to numerous banks, entities, and individual creditors. Defendant Attorney Whittles directly undertook this task, including the Tocco/Zada debt.[1] This task of global corralling of Zada's debt began in February or March of 2008. Zada gave Defendant Attorney a list of his creditors. Attorney Whittles did not know the actual amounts loaned by each to Zada. He only knew the amount Zada was willing to pay to settle the debt. Whether or not a creditor received interest depended on the creditor. There was no interest included in the amount Zada was willing to pay Tocco.

---

[1]Defendant Attorney had, in 2004, represented Plaintiff Tocco. Tocco was being represented at that time by the Michigan law firm of Hyman Lippett in litigation where Tocco was being sued by his grandfather in connection with their business interests in the Knollwood Cemetery. The Hyman Lippett firm also represented Zada at that time. The Hyman Lippett firm called Defendant Firm and asked it to be local counsel for Tocco in the lawsuit between Tocco and his grandfather that was then pending in the United States District Court for the Southern District of Florida. Specifically, Defendant Firm was hired to have the venue for that litigation changed from Florida to Michigan, and Defendants successfully completed that task. Also, in 2005, Defendant Firm sued Tocco for unpaid attorney fees, half of which were ultimately paid by Zada on Tocco's behalf. (Whittles Dep. at 78-83; Defs.' Ex. 8, Lippett Dep. at 4-7.)

Zada and Tocco handled the details themselves, then Zada gave Defendant Attorney the dollar amount Tocco was willing to accept to settle the debt. In exchange for repayment, Zada wanted releases. Defendant Attorney communicated with Zada's debtors, telling them what his client authorized him to say. Zada authorized Defendant Attorney to give more information to some than others, but the message was typically the same: Zada was expecting money on a certain date; to obtain payment, the creditor was expected to return a signed release with the understanding that Defendant Firm would not use it or give it to Zada or do anything else with it until after the creditor was paid; and to facilitate quick disbursement of expected Zada money to the creditor, the creditor should provide Defendant Firm with the appropriate wire transfer information. Defendants had to repeat this process numerous times when the promised date for funds came and went for various reasons, i.e., necessary documents not completed for required fund transfers. (Whittles Dep. at 61, 77-78, 90-109, 112-114, 122, 264, 276-78.)

When Defendant Attorney was assigned the task of settling the list of outstanding debts that Zada gave him, it was his understanding that, other than the Saudi inheritance expectancy, Zada was in dire financial condition, with outstanding debts far exceeding his unencumbered assets. It was his belief that Zada had no money of his own but was able to maintain his expensive lifestyle by borrowing money from friends and family. (Whittles Dep. at 61, 76, 88-91, 98-99, 181, 264-65; Defs.' Ex. 16, Whittles Dep. Ex. 2, List of Zada Creditors.)

Defendants believed their client Zada's representations that he had a Saudi inheritance expectation of over $1 billion that was bequeathed to him by a male member of the Saudi royal family with whom Zada enjoyed a close personal relationship; that he had

10

not yet received the inheritance because certain members of Saudi royalty were challenging the bequest; that those challenging his bequest knew about Zada's precarious financial condition and were pressuring him to take less than he was bequeathed; that this matter required strict attorney/client confidentiality; and that his expected inheritance should be released to him in the near future through the intercession of individuals who had direct access to the Saudi royal family, i.e., London-based business consultant Mohamed Zarrouk (whom Tocco met in person in London) and German businessman Peter Miller, as soon as certain documents were signed and money transfers approved.  (Whittles Dep. at 29-37, 58-59, 65, 72, 90, 101, 119-120, 121, 125, 134-35, 137-39, 140-146, 172-77, 186, 189, 202, 205, 206-07, 217-218, 224, 226-227, 230-32, 258-59, 299-300, 301-303.)  Defendant Attorney testified that he did not stop believing Zada's representations that the payment of funds from his inheritance expectancy was imminent until sometime after Defendants withdrew from their representation of Zada in November 2009.  (Whittles Dep. at 21, 191-92.)  In fact, he testified that he believed that payment of the Zada inheritance expectancy was imminent "more than [he] believed in any other case ever" even though this was promised but did not occur over 15 times.  (Whittles Dep. at 192.)  When Tocco asked, Defendant Attorney stated his continued belief in Zada's representations.  (Tocco Dep. at 54.)

Zada gave Defendant Attorney a copy of the will or a portion of the will, written in Arabic, that purportedly contained the bequest to Zada.  Zada instructed Defendant Attorney to keep this document under lock and key.  Zada requested the copy back in March or April of 2009.  (Whittles Dep. at 72-73.)  Zada and/or the Hyman Lippett firm also gave Defendant Attorney financial documents from Saudi Arabia and other documents in

11

support of Zada's claim of an inheritance expectancy and a $80 million private loan issued by a Saudi Arabian resident. (Whittles Dep. at 48-51, 53-54, 56-58, 70-78.) Zada had been referred by Stephen Mathison, a respected and successful Florida real estate and transactional attorney who also represented Zada. Attorney Mathison verified certain Zada documents and indicated that he had spoken on Zada's behalf with a royal Saudi representative. (Whittles Dep. at 16, 32-33, 40-43, 45-46, 186, 219-221, 223, 239-240.) Defendant Attorney remained in constant contact with Zada's various attorneys, agents, and representatives who were working on the receipt and distribution of Zada's Saudi inheritance expectancy, including Mathison, Zarrouk, Peter Miller, and Jim Sansoterra (Zada's personal financial advisor from California who formerly worked for Comerica). (Whittles Dep. at 29-31, 34-36, 40, 59-69, 72, 217, 224, 276, 302-03).

### D. 2008 - Zada/Tocco Debt Discussions - Zada Is Represented by Defendants and Tocco is Represented by Attorney Simjanovski

Defendants' representation of Zada in connection with the debt he owed Tocco lasted approximately one year. In late February or early March 2008, Defendant Attorney first communicated with Tocco about money Zada owed him, and his representation of Zada as to the Zada/Tocco debt ended before March 5, 2009. In March 2009, Zada's legal representation in Michigan was handled by the Hyman Lippett firm. (Whittles Dep. at 102, 306-308.)

Tocco confirms that his conversations with Defendant Attorney began around this time. (Tocco Dep. at 128.) Tocco's attorney, Daniel Simjanovski, confirms that he began communicating with Defendants in the first quarter of 2008 regarding the debt Zada owed Tocco. (Simjanovski Dep. at 19-21.) Attorney Simjanovski last communicated with

Defendant Attorney in late 2008.  He terminated his representation of Tocco in the Fall of 2008 when Tocco failed to take his advice to get in a pickup truck and go down to Florida and pick up the personal property collateralized in the 2007 UCC Financing Statement. (Simjanovski Dep. at 57, 81-82.)

Tocco's attorney Simjanovski and Defendant Attorney had about a dozen phone calls and one in-person meeting during that time period.  Each phone call was nearly identical -- Simjanovski would ask where's the $2 million Zada owes Tocco, when will it get here, and what is it's status -- and Defendant Attorney's response was the same -- that Zada was expecting a large sum of money, that Zada had funds in an offshore escrow account that would be released, that Tocco would be repaid by an anticipated date that came and went, and that Defendant Attorney could not give more details because he was bound by rules of client confidentiality.  (Simjanovski Dep. at 20-24, 28-30, 32, 78-79.)  Prior to speaking with Defendant Attorney, Attorney Simjanovski had spoken with lots of other attorneys who were representing Zada, including the Hyman Lippett firm, who all told him the same thing -- the money is coming and Zada cannot pay you until it comes.  Attorney Simjanovski told Tocco about each of these calls.  From the beginning, Attorney Simjanovski thought Zada was not trustworthy and never believed him.  Although he initially thought Defendant Attorney was just following his client's demands, Simjanovski started having doubts about the information Defendant Attorney was providing.  It was attorney Simjanovski's concerns that led to the August 2008 in-person meeting with Defendant Attorney.  Not immediately, but sometime after that August 2008 in-person meeting, Simjanovski came to believe that Defendant Attorney was not being honest with him.  (Simjanovski Dep. at 25-26, 31-32, 88-90, 94-95, 103-106.)  He advised Tocco several times to sue Zada, but Tocco ignored his

13

advice.  (*Id.* at 27, 96.)  Despite all this, Attorney Simjanovski testified that he did not conclude that Zada was never going to be collectible until right before Simjanovski terminated his representation of Tocco in the Fall of 2008.  (Simjanovski Dep. at 72, 90-94.) He admits that as part of his initial investigation, he learned that Zada had lots of loans with banks and other private individuals.  (*Id.* at 36.)  He concedes that he could have found out whether Zada was collectible if he had pursued a lawsuit and conducted discovery.  He admits that he did not consider that until late 2008 and did not pursue litigation or discovery at that time because he was convinced that Zada was uncollectible.  (*Id.* at 101-02, 108.)

### E.  2008 - Tocco/Whittles Direct Communications

Tocco's attorney, Daniel Simjanovski, was aware that Tocco was directly communicating with Defendant Attorney in 2008 (as well with Zada).  (Simjanovski Dep. at 59-60, 83.)  Defendant Attorney testified that Zada asked him to speak with Tocco, and Tocco understood that Defendant Attorney was representing Zada in this matter.  (Whittles Dep. at 38, 79-80.)  Tocco and Defendant Attorney had numerous written and oral communications throughout 2008.   Although the content varied, the gist of their conversations was that Zada was expecting a large Saudi inheritance, that Zada was reconfirming his commitment to repay the amount Zada agreed to pay Tocco,[2] that the money was expected on a certain date, and that Defendant Attorney needed wire transfer

---

[2]On March 1, 2008, Zada and Tocco executed a satisfaction of debt and release, without the assistance of Defendant Attorney, acknowledging that Zada owed Tocco $3,297,541.00.  (Defs.' Ex. 14, 3/1/08 Satis. of Debt & Release; Tocco Dep. at 161-163; Whittles Dep. at 104, 199-200, 275.)   Tocco and Zada subsequently renegotiated the amount Zada was willing to pay Tocco to $4,797,541.00.  (Whittles Dep. at 115-116.)

information from Tocco to facilitate Zada's repayment. Defendants would prepare each time for the Zada money to arrive, would get the bank transfer paperwork set up, but the date would come and go. Defendant Attorney would receive an explanation from Zada or his representatives for the delay, and Defendant Attorney would relay that information to Tocco (and other Zada creditors) and once again complete preparations for the transfer of Zada money on a new date. The same pattern repeated several times in 2008. (Whittles Dep. at 102-103, 104, 115, 200, 275.)

During this same time period, Tocco was being pressured by the friends and family members who had loaned him money that he in turn gave to Zada. At Tocco's request, Defendant Attorney called some of these individuals and explained that Defendants were working for Zada in connection with his repayment of outstanding debts, including the debt owed Tocco; that Defendants had a plan in place for an orderly distribution of the expected Zada monies once they were received; that Zada was expecting the money by a certain date along with an explanation for a delay, if any; that Defendants could not control when Zada got his money; and that Defendants would continue to work hard to get Tocco and everybody else repaid as soon as possible by making sure that, once the Zada money is received, it gets quickly disbursed to all creditors, including Tocco. (Whittles Dep. at 160-170.) The content of these conversations is reflected in March and April 2008 emails exchanged between Tocco and Defendant Attorney.

On March 21, 2008, in response to Tocco's request that he prepare a letter that Tocco could show to friends and/or family members that were pressuring Tocco for repayment, Defendant Attorney wrote:

Sam, how about this:

15

Dear Sam:

I write to give you a <u>status report</u>.  <u>I spoke with Mr. Zada's representative</u> in Europe regarding his <u>inheritance expectancy</u>, and <u>he advised me</u> that the settlement agreement has been signed and approved and that all legal documents necessary to effect a transfer of funds for Mr. Zada's benefit have been executed.  <u>They are waiting on the European bank</u> to which the funds are being transferred to finalize the paperwork that accepts the funds.  <u>I am told</u> that <u>could take place, literally, at any moment</u>.  <u>That same person also represented to me</u> that he could foresee no set of circumstances where the funds are not fully in place by the end of this month and in all probability will take much less time.

I hope this letter provides you with some comfort that we are very, very close and that this matter should be resolved very soon.

(Defs.' Ex. 17, 3/21/08 email chain) (emphasis added).  That same day, Tocco approved the letter and thanked Defendant Attorney, and a final version of the letter was sent to Tocco on March 24, 2008.  (*Id.*; Defs.' Ex. 18, 3/24/08 emailed letter; Whittles Dep. at 132-141.)

On March 26, 2008, Defendant Attorney emailed Tocco asking for his street address, and informing Tocco, "I have confirmation funds are in place and are ready for wire." (Defs.' Ex. 26, 3/26/08 email; Whittles' Dep. at 116-18.)

Defendant Attorney testified that he had obtained the information in these March communications from Zada and Zarrouk.  Although Defendant Attorney asked Zada to provide him with a copy of the referenced paperwork, Zada refused and explained that the situation was too delicate to do so because the Saudi individuals involved with the inheritance expectancy distrusted lawyers.  (Whittles Dep. at 117, 119-120, 131-36, 139-40.)  Defendant Attorney believed Zada and did not suspect that Zada's insistence upon secrecy and confidentiality was part of a plan to dupe Zada's creditors.  (Whittles Dep. at 117, 121.)

In early April 2008, Tocco and Defendant Attorney had more email communications. On April 1, 2008, Defendant Attorney requested and Tocco provided his wire transfer information.  On April 3, 2008, Tocco asked and Defendant Attorney agreed to call some individuals who were pressuring Tocco about repaying money that he had borrowed from them and then loaned to Zada.  Tocco wanted Defendant Attorney to call and explain that Defendants were on top of the situation; that they represented Zada and were trying to coordinate Zada's repayment of outstanding debts to creditors, including Tocco; and as soon as Zada came into his money, Defendants had a plan in place to make sure everyone, including Tocco, got repaid as soon as possible.  (Defs.' Ex. 21, 4/08 emails; Whittles Dep. at 158-164.)

Despite Zada's outstanding debt to Tocco and despite Tocco's own financial difficulties, including money obligations in connection with the foreclosure of his Grosse Pointe home and litigation with his grandfather concerning Knollwood Cemetery, Tocco continued to loan Zada money.

After April 21, 2008, Tocco loaned Zada approximately $857,000.00 based on Zada's representation that there was some type of fee he had to pay to get his inheritance expectancy.  (Tocco Dep. at 98-99, 113-115, 125-26, 174; Defs.' Ex. 13, Pl.'s Interrog. Ans. No. 2.)

On June 6, 2008, Tocco and Zada entered into a Settlement Agreement that Defendant Attorney drafted.   The Agreement provided that Zada owed Tocco $3,297,541.00; that Zada would pay Tocco that amount by June 18, 2008; that if Zada did not pay Tocco that amount within five days after June 16, 2008, then Zada agreed to the entry of a judgment against him in the amount of $3,297,541.00, plus interest and

reasonable attorney fees and litigation costs; and that if Zada paid, then Tocco and Zada would exchange executed mutual releases.  (Defs.' Ex. 20, 6/6/08 Settl. Agree. & Release; Tocco Dep. at 172-73; Whittles Dep. at 189-190.)   Zada did not make the promised $3,297,541.00 payment within the five-day grace period.  (Tocco Dep. at 173; Whittles Dep. at 191.)  Nonetheless, Defendant Attorney still believed Zada's representations that the payment of his Saudi inheritance expectancy was imminent and Zada would soon be able to pay off his creditors.  (Whittles Dep. at 191-92.)

On August 8, 2008, Defendant Attorney wrote to Tocco confirming an earlier conversation where Defendant Attorney informed Tocco that he had advised Zada to wait until August 20, 2008 to accept funds to settle his inheritance expectancy so as to avoid a "very substantial penalty, which he would incur if he were to accept the funds prior to that date."  (Defs.' Ex. 22, 8/8/08 letter.)   The letter further informed Tocco that Defendant Attorney had received written confirmation "that the monies will be available for distribution on August 20, 2008, free of penalty to Mr. Zada," and that Defendants "plan to accept the funds on that date on his behalf," and that "[t]hese funds will be used, among other things, to immediately pay Mr. Zada's entire debt to you."  (*Id.*) (Emphasis added).  Defendant Attorney recalled that, at that time, he was having conversations with several of Zada's creditors and gave them all the same information that Zada, Zarrouk and Miller had provided to him and Zada had authorized him to share with his creditors -- that there was a faction of the Saudi royal family that was still challenging his inheritance and offering to pay him less than his entire expectancy if Zada accepted payment before August 20, 2008; that if Zada waited until that date he would not be penalized and would get a substantial amount more money; and that Defendants had advised Zada to wait the few more weeks.

(Whittles Dep. at 172-174, 249-252, 258.)  Despite the letter's statement that Zada's money would be available on August 20, 2008 and that Defendants planned to accept the funds on that date, Tocco testified that he believed Defendant Attorney had the funds in a New York bank account belonging to Defendant Firm.  (Tocco Dep. at 175-178, 222-223.)

On August 14, 2008, at Tocco attorney Simjanovski's urging and Zada's direction, Defendant Attorney traveled to Michigan to meet with Tocco and Simjanovski at Simjanovski's Mt. Clemens office.  (Simjanovski Dep. at 105; Whittles Dep. at 256-257; Tocco Dep. at 99-100.)  The meeting was short, lasting less than one hour.  Defendant Attorney basically reiterated to Tocco and his attorney, Simjanovski, the information that was in his August 8, 2008 letter -- that Defendant Attorney had advised Zada not to accept his Saudi inheritance expectancy early because to do so would result in his obtaining substantially less money than he would receive if he waited and that the Zada money was expected on August 20, 2008.  Defendant Attorney also assured Tocco and Simjanovski that he believed Zada and believed that the Tocco/Zada debt would be resolved.  (Whittles Dep. at 170-175, 258-260; Simjanovski Dep. 38-39.)  Attorney Simjanovski and Tocco, who were frustrated with the delays, asked more questions.  Simjanovski asked Defendant Attorney for more specifics about the status of the transfer of Zada's funds, i.e., location and required signatures and whether he had spoken with anyone or seen documentation as to the value or status of the wire transfers.  Defendant Attorney replied that he had seen documentation as to the value of the money to be transferred, that he had spoken with bank representatives handling the transfers from overseas to New York, and that they told him they were waiting for a final signature before the funds could be released and transferred.  It was Simjanovski's understanding that, at that time, the funds were still in

19

London.  Defendant Attorney did not tell him a specific amount that would be transferred to Zada, only that it was a substantial amount; that Tocco's claim constituted a very small fraction of it; that there would be two or three phases of transfers before the funds actually arrived in Defendant Firm's client trust account; and Defendant Attorney had only seen documentation for one part of the transfer process showing that the process was actually beginning.  (Simjanovski Dep. at 38-41, 44-49.)  Defendant Attorney denies that he told Simjanovski or Tocco at that meeting that he saw documents that verified a specific money transfer, but does recall that it was around that time that Zada told him that funds had been transferred from London to New York.  (Whittles Dep. at 261, 264.)

Tocco and Defendant Attorney agree that Defendant Attorney assured him that Zada's repayment of his financial obligation of over $1 million to another creditor, Worldwide Entertainment, was an indication of Zada's willingness to satisfy his obligation to other creditors like Tocco.  (Whittles Dep. at 262; Tocco Dep. at 179.)

Tocco's notes from the August 14, 2008 meeting indicate "$ is in his client's trust account.  He has confirmed verified (John) Whittles."  (Pl.'s Ex. P, Tocco handwritten notes.)  When asked what these notes mean, Tocco testified at his deposition that:

> This is -- if I remember correctly, this is when he said the money was in the New York account, it was domesticated in the New York account and it was in his client trust account.

(Tocco Dep. at 181, 182.)  He also confirmed Defendant Attorney's testimony that he informed Tocco and Simjanovski that Defendants had advised Zada not to take an early payment penalty and to wait and get his full inheritance expectancy that was expected in about another week; that Defendant Attorney could not show them anything confirming this because of client confidentiality; and that Tocco would soon be repaid the debt Zada

20

agreed he owed Tocco.   (Tocco Dep. at 181.)   Contrary to Tocco's testimony that Defendant Attorney told him at the August 14, 2008 meeting that the Zada money was then in Defendant Firm's client trust account, Attorney Simjanovski testified that Defendant Attorney did not make this statement until a short time after that August 14, 2008 in-person meeting.  (Simjanovski Dep. at 32, 77, 81-82, 94-95.)

Despite Tocco's testimony that Defendant Attorney told him that the Zada money was in Defendant Firm's New York trust account on August 14, 2008, subsequent August 2008 text messages and an August 28, 2008 affidavit show otherwise.

In text message exchanges between Defendant Attorney and Tocco spanning from August 23 to August 26, 2008, Tocco repeatedly asked whether Defendants had received the federal ID number that they were waiting to receive before the Zada monies could be wired to Defendant Firm's client trust account:

> John, if the funds have transferred, the funds should be in your trust account. You won't need a fed ID; correct?  It should be immediate.  Can you confirm with your bank.  Let me know.

(Defs.' Ex. 29, 8/26/08 text at 12:37.)  Tocco texted again that same day at 3:07 asking, "John, what's the status?  Is funds in your account or not?  Please reply?" (*Id.*, 8/26/08 text at 3:07.)  Defendant Attorney's reply came at 3:42 p.m., stating "Not yet." (*Id.*, 8/26/08 text at 3:42.)  Defendant Attorney explained that, at that time, Zada had told Defendants that his funds were in a New York bank, and Defendant Firm was asking for a federal ID number to facilitate a transfer of monies from the New York bank to its client trust account at City National Bank.  Defendants never did receive a federal ID number despite their demands for one.  (Whittles Dep. at 269-274.)

21

On August 28, 2008, Defendant Attorney prepared an Affidavit at Tocco's request. Tocco had some kind of court proceeding pending and asked Defendant Attorney to explain at the court hearing that Zada did not dispute that he owed Tocco a substantial sum of money; that payment was expected soon; and that delays in repayment had been outside the control of Defendant Attorney, Zada, and Tocco. Defendant Attorney told Tocco that he could not appear at the court hearing but would prepare an Affidavit for him to present to the judge. (Whittles Dep. at 274-275.) Defendant Attorney's Affidavit provides, in pertinent part, that:

> 2. I am an attorney licensed to practice law in Florida. I represent Mr. Joseph P. Zada in various matters and, as part of that representation, I am coordinating payment for Mr. Zada of a substantial financial obligation owed to Sam Tocco.

> 3. We have been expecting a substantial payment on Mr. Zada's behalf, which payment would be more than sufficient to satisfy Mr. Zada's debt to Mr. Tocco. It has been confirmed to me in writing that the payment is undisputed. However, there have been delays in delivery outside of the control of myself, Mr. Zada and Mr. Tocco. I have been working diligently on behalf of Mr. Zada to expedite payment and will continue to do so. Although I am unable to guarantee an exact date or time of payment, we are expecting payment in a matter of days or less.

(Defs.' Ex. 23, 8/28/08 Whittles Aff.) (Emphasis added). Tocco insists that he did not read this Affidavit as saying Defendants did not have the Zada money in their client trust account and is not sure if he discussed or showed this Affidavit to Attorney Simjanovski. (Tocco Dep. at 184-186.)

In early October 2008, Defendant Attorney and Tocco exchanged text and email messages.

On October 1, 2008, there is a series of text messages between Defendant Attorney and Tocco. Defendant Attorney first texts, "I will let you know as soon as I have

confirmation." (Whittles Dep. at 279.)  Tocco replies, "Confirmation on wire ID?," and Defendant Attorney responds, "As soon as I have status, I will let you know, and transfer into the account number you gave me." (Whittles Dep. at 280-281.)  And Tocco replies, "K. Any news deposit?," and Defendant Attorney responds, "Just called bank here.  Nothing yet." (Whittles Dep. at 281.)  Again, this referred to confirmation of the federal ID number that would immediately precede funds being transferred to Defendant Firm's client trust account, and Defendant Attorney's communications were based on information provided to him from Zada.  (Whittles Dep. at 280-81; Defs.' Ex. 29, 10/08 text messages.)

On October 6, 2008, there was a text message from Tocco to Defendant Attorney asking, "John, please call me when you arrive the office.  I am looking for the letter as we discussed.  For Tuesday funds.  Thank you." (Whittles Dep. at 281-82; Defs.' Ex. 29, 10/08 text messages.)  Defendant Attorney testified that Tocco had asked him to write a letter explaining the status of Zada's anticipated repayment of the debt owed Tocco.  (Whittles Dep. at 282-83.)

There were also email messages between Tocco and Defendant Attorney on October 6, 2008.  (Defs.' Ex. 24, 10/6/08 email chain.)  Based on Defendant Attorney's recollection, during this period of time, Defendants were waiting hour-to-hour for Joe Zada to provide them with a federal ID number so the Zada funds could be transferred into Defendant Firm's client trust account.  (Whittles Dep. at 284.)  At 11:33 a.m., Tocco emailed Defendant Attorney asking, "John, <u>are we still on target for the funds</u> <u>hitting your account</u> <u>tomorrow</u>?  Also, can I get that letter?" (Defs.'s Ex. 24, 10/6/08 email chain; Whittles Dep. at 283-84; Tocco Dep. at 195-96.) (Emphasis added).  At 11:37 a.m., Defendant Attorney responds, "Sam, I am on the line and have a letter written.  I'm waiting for Joe to get back

23

to me on the language of the letter.  We are absolutely <u>expecting confirmation and funds</u> <u>tomorrow</u>.  I will call you as soon as I hear from Joe."  (Whittles Dep. at 285) (Emphasis added).  Tocco replies, "Thanks John."  (Defs. Ex. 24, 10/6/08 email chain.)  And, at 11:39 a.m., Defendant Attorney responds, "Feel free to use these emails until I get Joe on what a formal letter says."  (*Id.*)

On October 6, 2008, Defendant Attorney sent Tocco a letter, via email, regarding repayment from Joseph P. Zada that stated:  "I have been advised that <u>I will have</u> <u>confirmation of a wire transfer tomorrow morning, Tuesday, October 7, 2008, and will be</u> <u>able to wire funds shortly thereafter</u>."  (Defs.' Ex. 27, 10/6/08 letter.)  The funds did not transfer on October 7, 2008 despite Mr. Zada's representations to Defendant Attorney. (Whittles Dep. at 286.)

Despite the anticipatory language in the early October text and email messages and letter, Tocco testified that he believed the Zada money was in a trust account in New York that was under Defendants' control.  (Tocco Dep. at 194-97.)

On October 7, 2008, there is another series of emails between Defendant Attorney and Tocco.  At 10:15 a.m., Tocco emailed Defendant Attorney asking, "John, what time can I expect positive results?  Keep me posted, as my phone will not stop ringing with anxious people."  (Defs.' Ex. 28, 10/7/08 email chain; Whittles Dep. at 287.)  At 2:30 p.m., Tocco emailed again asking, "John, what is the status.  Please update me.  I have people seriously calling me.  And one in Tears.  John please reply."  (*Id.*)  At 2:42 p.m., Defendant Attorney replied, "On the phone with Joe now.  We might get pushed into tomorrow.  I'll call you as soon as I get off."  (*Id.*)  Defendant Attorney did not recall the specific reason for the delay, but believed that Zada was at that time promising Defendants hour-by-hour that a

24

federal ID number was going to be provided so a transfer to Defendant Firm's client trust account could occur.  (Whittles Dep. at 287-88.)  Finally, at 2:54 p.m., Tocco emailed back, "John I have never seen or dealt with anything so unusual, you have been so infatic [sic] this was closing out months ago. I have loved ones, friends, and ordinary people who have all lost their minds, emotions finances as they believe. I can only keep saying this so many times to people that each week with definate [sic] dates this will all be over.  John if this is not happening I would think I deserve facts that would explain this hold up so I may save everyones [sic] sanity. I wait your phone call." (Defs." Ex. 28, 10/7/08 email chain; Whittles Dep. at 288; Tocco Dep. at 197-99.)  Defendant Attorney believes that he called Tocco after receiving this email.  (Whittles Dep. at 288-89.)

On October 10, 2008, Defendant Attorney wrote a hand-delivered letter Tocco regarding payment from Joseph P. Zada that stated:

Dear Mr. Tocco:

First, I appreciate your patience.  We are working very hard to have this transaction completed.  I think that, based on what we accomplished this week, the wrinkles have been ironed out and I am expecting that funds will be sent to my trust account next week, with which we will settle my client's business indebtedness to you.

(Defs.' Ex. 30, 10/10/08 letter) (Emphasis added).  Despite his expectation that funds would be sent to his trust account the following week, Defendant Attorney testified that the funds were not wired to his trust account that week.  (Whittles Dep. at 289-90.)

There was another series of text messages in October 2008 between Tocco and Defendant Attorney.  (Defs.' Ex. 29, 10/08 texts.)  On October 10, 2008, Tocco texted, "John, call me, please." (Whittles Dep. at 290).  Then, on October 15, 2008, Tocco texted Defendant Attorney asking, "Do you have written confirmation yet?"  (*Id.*)  On October 21,

25

2008, at 9:08 a.m., Tocco texted Defendant Attorney, "John, your cell keeps cutting me off. Not sure if you can see me calling.  Please get back to me."  That same day at 5:45 p.m., Defendant Attorney responded to Tocco, "I have no new information.  I'll call you when I do."  (Whittles Dep. at 291.)  On October 24, 2008, Tocco texted Defendant Attorney asking, "John, can you write me a letter stating that you have a fed ID?  And what is it you are waiting on so I can give something to this receiver for cemetery.  He can pull my license at his wish at any time."  (Whittles Dep. at 291-92.)  Whittles did write the letter Tocco requested.  (*Id.* at 292.)  He recalled Tocco telling him that, as to his cemetery, some kind of regulatory agency was looking at him or wanting some information from him, and he needed Defendant Attorney to write a letter for him.  (*Id.* at 293.)  Defendant Attorney also explained that the significance of having a federal ID number was that this was proof that the money was in transit from one bank to another -- it signified that the wire transfer transactions were completed.  At the time Tocco was asking Defendant Attorney to confirm that he had a federal ID number, he could not do so because he did not have one. (Whittles Dep. at 293.)

Around this time, in October 2008, Tocco was still communicating directly with Zada but had doubts about him and told Zada that he was going to sue him.  (Tocco Dep. at 115-116.)  It was also around this time, in the Fall of 2008, that Tocco's attorney Simjanovski again urged Tocco to either sue Tocco or travel to Florida to claim the personal assets that had been collateralized in the 2007 UCC Financing Statement.  Tocco refused to do either. (Simjanovski Dep. at 81-83, 96.)

Tocco testified that he ignored his Attorney's advice because (1) Defendant Attorney said that the Zada funds were in his control, were in Defendants' client trust account, and

that it would be a day or two before Tocco got paid; and (2) he had already collateralized some of Zada's personal assets via the UCC Financing Statement and knew he could collect those assets when he wanted.  (Simjanovski Dep. at 82-83, 96; Tocco Dep. at 231-239.)

On November 21, 2008, Defendant Attorney drafted a document titled "Acknowledgement of Settlement and Mutual General Release (Joseph P. Zada and Sam Anthony Tocco)."  (Defs.' Ex. 31, 11/21/08 Settl. Agree.; Whittles Dep. at 293-94; Tocco Dep. at 200-203.)  Both Zada and Tocco executed the Agreement which provided that:  (1) Zada would promptly pay Tocco $4,797,541.00; (2) Tocco acknowledges that this is all he is owed by Zada or any entity under Zada's control; (3) Tocco and Zada agreed they would not bring any legal action against each other; (4) Tocco agreed to return to Zada all items on the attached Exhibit A[3] within five days from the date of the Agreement; (5) Tocco

---

[3]Exhibit A lists:

All artwork, furniture, antiques and collectibles which belong to Joseph P. Zada and which are located at any of the following locations, including but not limited to the items depicted in the attachments to this Exhibit A:

741 Lakeshore Road
Grosse Pointe Shores, MI 48236

3410 Old Hampton Drive
Wellington, FL 33414

Self Storage Security
1017 Southern Blvd.
Royal Palm Beach, FL 33411
Units #1239 (indoor) & G10 (outdoor)

Art Moves
225 NW 26th St.
Miami FL 33127

agreed to have his named entities to release any lien, security or claim of right of any kind involving Zada or H&K Assets, LLC. within ten business days after payment of the $4,797,541.00; (6) Tocco agreed not to discuss his business with Zada or any details about Zada or any Zada family members to any person, except where required to do so by law or when such disclosure is necessary to tax or legal advisors; (7) Tocco agreed to return to Zada any documents (whether in written, typed, or electronic format) that evidence or pertain in any way to any business between Tocco or Zada within ten days of the date of the Agreement; and (8) Tocco acknowledged that payment of the $4,797,541.00 was conditioned on his compliance with the terms of the Agreement.  (*Id.*)

Tocco testified that he signed this because it reassured him and he was hoping to get paid.  He did not, however, get his $4,797,541.00 payment from Zada as promised in that November 2008 Agreement.  (Tocco Dep. at 202-205.)

On December 17, 2008, Tocco emailed Defendant Attorney reminding him that, a few months earlier, he had prepared a letter to Tocco providing the status of Zada's anticipated repayment of the debt he owed Tocco so Tocco could show it to the State of Michigan in connection with Tocco's ability to cure a deficit owed the State and keep his license to operate Knollwood Cemetery and asking him to do so again.  The full content of that email is:

> John, I am in idle status with the state.  At any moment they will be responding to pulling my license.  Roughly a couple of months ago you wrote to me a letter also referencing the state that funds are owed to me and expected to be paid in a short time.  As we both know, these have not been satisfied.  Can you please write a letter to me -- please write me a letter as to the status as of today,

(Defs.' Ex. 31.)

28

keeping in mind I will need this for the state.  Please E-mail me a letter with an
update that I will forward to the state.

(Whittles Dep. at 295-96; Tocco Dep. at 205-07.)  Defendant Attorney agreed to provide

Tocco with the requested letter "and give him my opinion writing that I trusted that Mr. Zada

would come through."  (Whittles Dep. at 296.)  The information provided in the letter was

based on Defendant Attorney's conversations with Zada and Peter Miller.  Defendant

Attorney believed Zada's representations about the reasons provided for various delays;

that Zada was also frustrated by the repeated delays; that Zada was increasingly

concerned about the money he owed others and his creditors' growing frustration and

anger; that Zada still thought he would be able to repay all creditors, including Tocco; and

that the Zada inheritance funds were at that time being held at the Bank of New York.

(Whittles Dep. at 298-300, 301-302, 305-06.)

On December 23, 2008, Defendant Attorney electronically mailed a letter to Tocco

regarding payment from Joseph P. Zada that stated:

> Dear Mr. Tocco:
>
> Mr. Zada apologizes for the delay in payment, which delay was caused by
> circumstances beyond his control.  Mr. Zada re-acknowledges his debt to you
> and I am told that my trust account will be funded to facilitate your payment on
> or before January 5, 2009.  I will initiate a wire transfer to you immediately upon
> my receipt of funds and I will call you to confirm that transfer.
>
> Mr. Zada would like to thank you for your patience, especially considering that
> the delays we have experienced are in no way attributable to you.  We look
> forward to resolving this matter immediately.

(Defs.' Ex. 32, 12/23/08 letter) (Emphasis added).  Tocco testified that this letter was

provided to him in response to his December 17, 2008 email request.  (Tocco Dep. 207.)

Tocco also admitted that, based on the language in this letter, Defendant Attorney clarified that he did not have the money in his client trust account.  (Tocco Dep. at 207-08, 214-15.)

In the last quarter of 2008, Attorney Simjanovski had withdrawn as Tocco's counsel and severed communications with Defendant Attorney.  (Simjanovski Dep. at 50-51, 57-58, 81-82.)

In late December 2008, after the December 23, 2008 letter discussed above, Tocco had conversations with his counsel here, Mayer Morganroth.   (Tocco at 20-22, 215, 247-249.)  Tocco requested that Attorney Morganroth contact Defendant Attorney regarding the status of Zada's repayment of Tocco's debt.  Although Zada sometimes gave him money (Tocco Dep. at 247), at this time Tocco was having financial difficulties and was concerned that maybe he was not understanding the status of Zada's repayment and felt that if Attorney Morganroth spoke with Defendant Attorney he would be able to give him a better understanding.  (Tocco Dep. at 247-250.)

Attorney Morganroth testified that Tocco came to him in the latter part of December 2008 or early January 2009, and Morganroth agreed to and did call Defendant Attorney on Tocco's behalf.  (Defs.' Ex. 5, Morganroth Dep. at 6, 9, 14.)

In a very short telephone conversation, Morganroth asked Defendant Attorney "the status of the moneys that were to pay off my client, Sam Tocco."  (*Id.* at 15.)  Before he made the call, Tocco told him that Joseph Zada owed him about $5 million, and Zada was represented by Defendant Attorney.  Attorney Morganroth understood that Defendant Attorney "supposedly had control of funds" that Zada got from an inheritance that were supposed to be used to repay the Zada debt owed to Tocco.  It was his memory that Tocco

30

told him the money was in Defendant Attorney's client trust account, and he called to verify or confirm those facts. (*Id.* at 18-19, 61-65.) Morganroth testified that, during their phone conversation, Defendant Attorney told him "that the moneys were in his trust account and they'd probably be disbursed -- not probably, they would be disbursed in a day or two. In fact, I think he said the next day." (*Id.* at 19-22, 66.) Tocco was present during the conversation and overheard Attorney Morganroth's portion of the conversation with Defendant Attorney confirming that Tocco would get repaid within a day or two. (Tocco Dep. at 250-51; Morganroth Dep. at 66-67.)

Defendant Attorney recalls receiving a voicemail message from Attorney Morganroth in this time period and leaving him a voice message. He does not recall speaking with Morganroth personally, and denies that he told Attorney Morganroth that the Zada inheritance money was ever in his client trust account. (Whittles Dep. at 176-77, 314.) Defendant Attorney also denies that he ever told Tocco, any Tocco representative, Simjanovski, or anyone else that the Zada inheritance money was in his client trust account. (Whittles Dep. at 261-263, 316-317.)

Tocco did not get payment within a day or two, but Attorney Morganroth did not hear from Tocco again until some time in March 2009. (Morganroth Dep. at 67.)

On March 4 and 5, 2009, Tocco and Zada executed an Agreement captioned "Payment, Release, Standstill and Confidentiality Agreement." (Defs.' Ex. 40.) The Agreement identifies "Tocco's attorneys, Morganroth & Morganroth, PLLC, as escrow agent," and Attorney Morganroth executed it on March 5, 2009 as "Escrow Agent." (*Id.* at ¶ 3 and p. 9). Attorney Morganroth does not recall having a conversation with anyone about the Agreement before he signed it, but admits that Morganroth & Morganroth PLLC

31

were Tocco's attorneys on March 5, 2009 and that he either read or glanced through the Agreement at the time he signed it.  (Morganroth Dep. at 32-33, 68-69.)

Defendant Attorney did not draft this Agreement, was no longer representing Zada in connection with the debt he owed Tocco on March 5, 2009, and was aware that Zada's counsel in Michigan at that point in time was the Hyman Lippitt firm.  (Whittles Dep. at 307.) Tocco testified that he did not know who drafted the Agreement, but thought it might have been Attorney Doug Hyman, who he knew as counsel for Zada.  (Tocco Dep. at 208-09.) The Agreement provides that all notices to Zada are to be sent both to him and to Attorney Hyman.  (Defs.' Ex. 40, 3/5/09 Agreement at ¶ 12.)  The gist of the Agreement is that if Zada did not pay Tocco $4,797,541.00 in 45 days, then a consent judgment for that amount would be entered against Zada.  In pertinent part, the Agreement provides that:

.   Zada shall pay Tocco $4,797,541.00 within 45 days after March 5, 2009, i.e., April 20, 2009, as full and final payment of all amounts owing from Zada or the "Zada Entities" to Tocco (*id.* at ¶1);

.   Tocco, for himself and others collectively referred to as the "Tocco Releasors," upon receipt and clearance of the $4,797,541.00, release Zada and the Zada Entities from any and all claims they have had, have now, or may have in the future and agree not to in any way aid anyone else in pursuing claims against Zada or the Zada Entities (*id.* at ¶ 2);

.   If Zada does not pay the $4,797,541.00 with 45 days after March 5, 2009, "Zada and/or the Zada Entities" consent "to the immediate entry of a judgment in favor of Tocco" in the Wayne County, Michigan Circuit Court, "in the customary form of a consent judgment, in the principal amount of $4,797,541.00, such judgment to be placed in escrow with Tocco's attorneys, Morganroth & Morganroth, PLLC, as escrow agent, upon the execution of this Agreement, and to be held by such escrow agent under the terms of this Agreement and only entered in the event of a breach by Zada" by not paying; and if a consent judgment is entered, Zada and/or the Zada Entities will not interfere with its entry and will not take an appeal (*id.* at ¶ 3);

. If Zada does pay the $4,797,541.00 within the required time, the escrow agent shall immediately deliver the consent judgment to Zada (*id*);

. The Tocco Releasors are to keep the Agreement and other broadly defined information confidential (*id*. at ¶ 6);

. The Agreement constitutes the complete and entire agreement between the parties and supersedes all prior agreements, promises, and understandings relating to the subject matter (*id*. at ¶ 8);

. Tocco "acknowledges and agrees that this Agreement is knowingly, freely and voluntarily entered into, without duress or coercion, and that Tocco has consulted with counsel before execution of this Agreement, or has been advised of his right to do so and has chosen not to consult with counsel before such execution. Tocco further expressly acknowledges and agrees that: (a) he has carefully and completely read all terms and provisions of this Agreement and fully understands and accepts the provisions set forth in this Agreement and their consequences; (b) the consideration tendered to Tocco is in excess of, and above and beyond what Tocco is otherwise entitled to receive from Zada; and (c) Tocco's signature hereon confirms his willingness to enter into this Agreement (*id*. at ¶ 17); and

. Tocco agrees that, upon Zada's payment of $4,797,541.00 and its clearance, Tocco shall immediately pay Zada $320,373.68, and Tocco's failure to do so "shall be a material default of this Agreement," entitling Zada to all legal and equitable remedies under this Agreement or otherwise (*id*. at ¶ 18).

(Defs.' Ex. 40, 3/5/09 Agreement.)

So, as of March 5, 2009, Tocco had agreed that, if Zada failed to pay him as promised, the Consent Judgment that Attorney Morganroth was holding in escrow would be entered against Zada.

On April 17, 2009, Zada sent Tocco a letter enclosing a check in the amount of $5 million with an attached memo stating, "Do not deposit the check or contact the bank without authority from me. I will contact you with specific information regarding the time

33

and the branch location." (Whittles Dep. at 311-312; Tocco Dep. at 210.)   Tocco never presented the check for payment.   (Tocco Dep. at 212-13.)

On April 20, 2009, although the 45 days had elapsed, Tocco did not pursue entry of the Consent Judgment.   In fact, he did not do so until late July 2009.

Attorney Morganroth recalled that, between April 20, 2009 and July 28, 2009, Tocco came back to him with another document that extended the time Zada had to repay him and Zada agreed to pay $5 million, not $4.7 million.   (Morganroth Dep. at 34-35.)   At his later deposition, Attorney Morganroth testified that the next time he dealt with Tocco was in July 2009, and he learned at that time that Tocco had never been paid by Zada. (Morganroth Dep. at 69-71.)

On July 28, 2009, a Consent Judgment was entered in Wayne County Circuit Court. The Consent Judgment references the March 2009 Consent Judgment, that Zada owes Tocco $4,797,541.00, that Tocco owes Zada a set-off of $320,373.68, and grants Judgment in Tocco's favor against Joseph P. Zada.   (Defs.' Ex. 41, 7/28/09 Consent Judgment.)   Morganroth's firm drafted the Complaint that initiated Tocco's suit against Zada in which the Consent Judgment was entered.   Attorney Morganroth testified that, even though they filed the Complaint, neither he nor anyone in his firm ever read the March 5, 2009 Agreement that he signed.   (Morganroth Dep. at 37-38, 70-71.)

After the Morganroth firm started to pull information together from Tocco and other sources about Zada's assets in an attempt to execute on the Consent Judgment, they learned that a receiver had been appointed on August 21, 2009 in Fedorov's suit against Zada and concluded that they were precluded from continuing their efforts.   The

34

Morganroth firm turned all the information they had about Zada assets over to that receiver. (Morganroth Dep. at 39, 72-76.)

Zada filed for Chapter 7 bankruptcy in the Bankruptcy Court in the Southern District of Florida in 2010. (Defs.' Ex. 4; Pl.'s Ex. Q.)

On January 6, 2010, Tocco Attorney Morganroth wrote to Defendant Attorney providing notice to Defendants that Tocco was "going to hold them responsible for misrepresentations made to [Tocco] and for the moneys that he was to be paid [by Zada]." (Morganroth Dep. at 39-40.) Defendants responded, denying all assertions made in Morganroth's letter, including the assertion that Defendants represented Tocco in his dealings with Zada. (Defs.' Ex. 43, 3/1/10 letter.) Attorney Morganroth, in his reply, clarified that he was aware that Defendants never represented Tocco, but Defendant Attorney "spoke and met with Mr. Tocco and his then lawyer wherein Mr. Whittles represented that the funds to pay the obligation owed to Mr. Tocco was in your client trust account," and that Tocco intended to bring suit against Defendants for false representations that Whittles made to Tocco and Attorney Simjanovski both before and after the August 2008 in-person meeting, and instructing Defendants to refer Tocco's notice of intent to sue to their insurance carriers. (Pl.'s Ex. O, 3/5/10 letter.)

On January 4, 2011, Tocco filed this lawsuit alleging state law claims of fraudulent, negligent, and innocent misrepresentation, all in connection with Defendants' attempts to facilitate their client Zada's efforts to repay the multimillion dollar debt he admitted he owed Tocco.

**II.   Summary Judgment Standard**

35

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

36

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

### A.  Fraudulent Misrepresentation

Defendants' motion for summary judgment on Plaintiff's fraudulent misrepresentation claim is granted.  Viewing the evidence in the light most favorable to Plaintiff Tocco, there is no genuine issue of material fact that Defendants did not make false representations upon which Plaintiff reasonably relied to his detriment.

To establish a claim for fraudulent misrepresentation or actionable fraud, Plaintiff Tocco must present admissible evidence showing that:

(1) [t]hat defendant made a material misrepresentation;
(2) that it was false;
(3) that when he made it he knew it was false, or made it recklessly, without knowledge of its truth and as a positive assertion;
(4) that he made it with the intention that it should be acted upon by plaintiff;
(5) that plaintiff acted in reliance upon it; and
(6) that he thereby suffered injury.

*Lawrence M. Clarke, Inc. v. Richco Constr., Inc.*, 803 N.W.2d 151, 162 (Mich. 2011) (internal quotation marks and citations omitted).  The plaintiff must prove each element of his fraudulent misrepresentation claim "with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery." *Cooper v. Auto Club Ins. Ass'n*, 751 N.W.2d 443, 448 (Mich. 2008) (internal quotation marks and citations omitted).

The Michigan courts have fleshed out these elements.  "Fraudulent misrepresentation, of course, requires a *false representation* by the defendant.  A plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation."  *Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543, 549 (Mich. 2000).  Moreover, the plaintiff must "show that any reliance on defendant's representations was reasonable."  *Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005).

Michigan law also requires that the plaintiff establish that the alleged fraudulent misrepresentations "are statements of past or existing fact, rather than future promises or good-faith opinions."  *Cooper*, 751 N.W.2d at 452.  *See also Hord*, 617 N.W.2d at 175 (observing that "[a]n action for fraud must relate to past or existing facts, not future events.").  There are, however, exceptions to this general rule.  *Foreman*, 701 N.W.2d at 175.  As to statements of opinion, the Michigan courts have acknowledged that, "[w]hile expressions of opinion in good faith cannot be made the basis of recovery in a fraud action, statements of opinion <u>made in bad faith</u> by one who is possessed with superior knowledge respecting such matters, <u>with a design to deceive and mislead</u>, the party making them must

respond." *Id.* (internal quotation marks and citation omitted) (emphasis added).  As to statements about future events, the Michigan courts have recognized that "an unfulfilled promise to perform in the future is actionable <u>when there is evidence that it was made with a present undisclosed intent not to perform</u>," and "the mere fact that statements relate to the future will not preclude liability for fraud if the statements were intended to be, and were accepted as, representations of fact and involved matters peculiarly within the knowledge of the speaker." *Id.* (internal quotation marks and citation omitted) (emphasis added).  A related doctrine, "the so-called 'false token' exception to the general rule" has also been recognized.  "This exception pertains where, although no proof of the promisor's intent exists, the facts of the case compel the inference that the promise was but a devise to perpetrate a fraud." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 817 (Mich. 1976) (observing that this exception exists but finding that "the record is bereft of any such facts" that would allow application of the exception and further observing that the exception was recognized in a case involving a fiduciary relationship and there was none involved there).

Plaintiff Tocco alleges that Defendant Attorney Whittles made the following false representations of fact:  (1) that Zada had an inheritance expectancy that was large enough to satisfy his multi-million dollar debt to Tocco; (2) that Defendant Attorney had verified those facts; (3) that Zada intended to repay Tocco; (4) that Zada could avoid an early payment penalty and get a larger inheritance if he delayed receipt of that money in August 2008; (5) that Zada had received the inheritance money, that the funds were in place and ready to be wired, but disbursement to creditors like Tocco was delayed due to reasons

39

beyond his and/or Defendants' control; (6) that Defendant Attorney believed Zada's representations; (7) that Zada's repayment to Tocco was imminent; (8) that Zada's repayment to Tocco would occur on a future date certain; and (9) that Zada's inheritance money designated for disbursement to Tocco and other creditors was presently in Defendants' client trust account.  Plaintiff cannot establish a fraudulent misrepresentation as to any of these.

First, there is no evidence that, while representing Zada in connection with the Tocco/Zada debt, Defendant Attorney disbelieved representations made to him by Zada or his representatives, i.e., Zarrouk, Miller, or Mathison, that Zada had a Saudi inheritance expectancy that was large enough to allow him to repay debts he agreed he owed to the list of creditors, including Tocco, in the amounts he provided to Defendant Attorney; that he intended to repay Tocco the money he owed him; that Zada could avoid an early payment penalty and get a larger inheritance if he delayed receipt of that money in August 2008; that Zada had received the inheritance money but disbursement to creditors like Tocco was delayed due to reasons beyond his and/or Defendants' control; that Zada's repayment to Tocco was imminent; and that Zada's repayment to Tocco would occur on a future date certain.  Indeed, as evidenced by this case, the Fedorov litigation against Zada, and the SEC litigation against Zada, lots of people found Zada's representations believable.

The evidence presented here shows only that it was Defendant Attorney's opinion that representations made to him by Zada and his representatives were believable.  (Whittles Dep. at 29-37, 58-59, 65, 72, 90, 101, 119-120, 121, 125, 134-35, 137-39, 140-146, 172-

77, 186, 189, 202, 205, 206-07, 217-218, 224, 226-227, 230-32, 258-59, 299-300, 301-303.)  The evidence also shows that, based on representations and documents presented to him by Zada and/or his representatives, it was Defendant Attorney's opinion that Zada had a substantial Saudi inheritance expectancy that was more than sufficient to satisfy his acknowledged debt to Tocco.  (Whittles Dep. at 16, 29-31, 32-33, 34-36, 40-43, 45-46, 48-51, 53-54, 56-58, 59-69, 70-78, 186, 217, 219-221, 223, 224, 239-240, 276, 302-03.)  In fact, Defendant Attorney testified that he believed that payment of the Zada inheritance expectancy was imminent "more than [he] believed in any other case ever."  (Whittles Dep. at 192.)  He did not stop believing Zada's representations that the payment of funds from his inheritance expectancy was imminent until some time after Defendants withdrew from their representation of Zada in November 2009.  (Whittles Dep. at 21, 191-92.)  *See Vora v. Prather & Assoc., P.C.*, No. 214558, 2001 WL 1585046, at *5 (Mich. Ct. App. Dec. 11, 2001) (rejecting the plaintiff's arguments that defendant attorney's "constant assurances to plaintiff that there was no need to worry was in fact a material misrepresentation" and quoting Michigan Standard Jury Instruction 128.10 "which states '[a] material fact cannot be opinion, belief, speculation or prediction.  It must relate to something past or present that can be proved or disproved.'").[4]

_____

[4]Plaintiff's reliance on a recent Sixth Circuit decision, *Ouwinga v. Benistar 419 Plan Servs, Inc.*, 694 F.3d 783, 796-97 (6th Cir. 2012), is misplaced.  There, unlike here, the lawsuit was at the motion to dismiss stage where the facts alleged were required to be taken as true and the plaintiffs had alleged that "the Lawyer Defendants were giving legal tax advice not only to . . . its direct client, but also to the intended recipients, taxpayers evaluating the [purported tax-deductible welfare benefit] Plan" and there was Supreme Court precedent recognizing that "'[w]hen an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice.'"  *Id.* at 797 (quoting *United States v. Boyle*, 469 U.S. 241, 250 (1985)).  At that stage of the litigation, and in light of the cited Supreme Court precedent, the Sixth

Likewise, there is no evidence an exception to the general rule -- that fraudulent misrepresentation claims cannot be based on good-faith opinions -- would apply under the facts presented here.  Contrary to Plaintiff Tocco's assertions here, there is no evidence that would give rise to a reasonable inference that Defendant Attorneys' expressions of his above-described beliefs and opinions were "made in bad faith . . . with a design to deceive and mislead."  *Foreman*, 701 N.W.2d at 175.  While it is true that "direct proof of fraud is not required, and fraud may be proven by inference from facts and circumstances," *id.* at 176, the facts and circumstances in this case do not give rise to a reasonable inference that Defendant Attorneys' stated beliefs and opinions regarding Zada's repayment of the Tocco debt were made in bad faith with a design to deceive and mislead.  Plaintiff Tocco has not presented any evidence refuting Defendant Attorney's testimony that he believed that payment of the Zada inheritance expectancy was imminent "more than [he] believed in any other case [he was involved in] ever."  (Whittles Dep. at 192.)  Because he has not presented evidence showing that Defendant Attorney knowingly made a false statement, Tocco cannot defeat Defendants' motion.  *See Vora*, 2001 WL 1585046 at *5 (concluding that the "plaintiff failed to establish a prima facie case of actual fraud" because the evidence presented "fail[ed] to establish that defendant knowingly made a false statement").

Next, several of the fraudulent misrepresentations that Plaintiff Tocco claims Defendant Attorney made address statements about future events, i.e., that Zada's payment to Tocco was imminent or would occur at a near date in the future.  These are

_____

Circuit concluded that "it is plausible that the [plaintiffs] could show reliance on the [Lawyer Defendants'] opinion letters.  Because this case is at the summary judgment stage, Plaintiff cannot rely on the *Ouwinga* decision to show that he reasonably relied on Defendant Attorney's alleged misrepresentations.

statements about future events, and it is well-established in Michigan law that "[a]n action for fraud must relate to past or existing facts, not future events." *Hord*, 617 N.W.2d at 175. Again, Michigan law recognizes exceptions to this general rule. There is no evidence, however, that an exception would apply to the facts and circumstances of this case.

There is no evidence that, when Defendant Attorney made these statements about future events -- that Zada was expecting inheritance money, that wire transfers were forthcoming, that Zada would be repaying his multi-million dollar debt to Tocco on a certain future date -- he did so "with a present undisclosed intent not to perform." *Foreman*, 701 N.W.2d at 175. All the evidence cited above concerning Defendant Attorney's good-faith opinions and beliefs is to the contrary and refutes an inference that he made these statements with a present intent not to perform. Defendant Attorney consistently stated his belief that Zada would soon be obtaining funds sufficient to repay Tocco; that Zada intended to repay Tocco once he got the money; that the delays were caused by events beyond Zada's and Defendant Attorney's control except the one instance where Defendant Attorney advised him to wait a few weeks in August 2008 so as to avoid getting a significantly lesser sum of money; and that Defendant Attorney believed Zada and his representatives when he relayed this information to Tocco and Tocco's counsel. The facts of this case do not "compel the inference" that these challenged statements about future events were "but a devise to perpetrate a fraud" and thus cannot establish "the so-called 'false token' exception to the general rule." *Hi-Way Motor Co.*, 247 N.W.2d at 817.

Finally, the evidence does not show or support a reasonable inference that Defendant Attorney's statements "were intended to be, and were accepted as, representations of fact,

43

and involved matters peculiarly within the knowledge of the speaker." *Foreman*, 701 N.W.2d at 175.  The evidence does not show that Defendant Attorney intended that his statements be accepted by Tocco as factual representations, promises, or guarantees that Zada had access to sufficient money and would repay Tocco by a certain date.[5]  *See Foreman*, 701 N.W.2d at 175.  Rather, as discussed above, this evidence shows that Defendant Attorney's communications with Tocco and Attorney Simjanovski about future payment dates were good-faith opinions based on representations from and information provided to him from Zada and/or his representatives; not future promises.  Moreover, Tocco admits that he was directly communicating with Zada during the entire time Defendant Attorney was representing Zada.  He admits that Zada provided him with documents like the ones Zada provided to Defendant Attorney as proof of his inheritance expectancy and bank statements as proof of his ability to repay him.  (Tocco Dep. at 20-21, 38-39, 41, 43-45, 98-99, 105-106, 113-116, 126, 150, 174, 239-240, 244.)  Furthermore, there is no evidence here that Defendants made false promises of future conduct with fraudulent intent.  *See Cummins v. Robinson Twp.*, 770 N.W.2d 421, 436-37 (Mich. Ct. App. 2009) (acknowledging "that some caselaw recognizes that an exception to the "no-fraud-if-statements-about-future-events" rule but finding the facts in those decisions "factually distinguishable from the present case" where "[t]here is no claim that defendants

---

[5]Plaintiff's assertion that, at the time Zada was promising payment by a certain date and payment was not made, "Whittles knew that Zada had bounced checks worth millions to countless creditors" is not supported by the transcript pages he cites in his Response at 16.  Moreover, evidence that Zada's December 2008 check in the amount of $264,539.69 and his April 2009 check in the amount of $400,000 to Defendant Firm as payment for outstanding legal fees bounced is not evidence from which a reasonable inference could be drawn to support Plaintiff's claim of fraudulent representation.  (Whittles Dep. at 296-97, 310-311.)

made false promises of future conduct with fraudulent intent upon which plaintiffs detrimentally relied."). Finally, for reasons discussed more fully below, Tocco cannot show that he reasonably relied to his detriment on Defendant Attorney's representations about future events.

Now the Court addresses Plaintiff's argument that Defendant Attorney fraudulently misrepresented that Zada's inheritance money designated for disbursement to Tocco and other creditors was presently in Defendants' client trust account. Construing the evidence in the light most favorable to Plaintiff and assuming Defendant Attorney did indeed make this misrepresentation to Tocco, to Attorney Simjanovski between mid-August and the Fall of 2008, and to Attorney Morganroth in either December 2008 or January 2009, Plaintiff cannot show that he reasonably relied on Defendant Attorney's misrepresentation to his detriment.

Plaintiff Tocco claims that he delayed filing for bankruptcy, delayed filing suit against Zada, and delayed going to Florida or taking other action to obtain Zada's personal property collateralized in the 2007 UCC Financing Statement that Attorney Simjanovski prepared for him because he relied on Defendant Attorney's false representation that Zada's inheritance money was in Defendants' client trust account or an account over which they had control. The evidence does not support Plaintiff's claim of reasonable reliance.

First, under prevailing Michigan law, it would not be reasonable to do as Tocco did here -- ignore his own attorney's legal advice and instead rely on representations made by counsel for the man who owed him millions of dollars. Despite Tocco's claims to the contrary, and as evidenced by his ultimate suit and consent judgment against Zada, Zada

45

was his debtor and adversary. Zada and Tocco's adverse interests became evident in August 2008 when Defendant Attorney advised his client Zada not to accept his inheritance expectancy immediately but at a reduced amount despite Tocco's adverse interest in immediate payment that would allow Tocco to avoid bankruptcy and would allow him to repay people who were pressuring him to repay the money he had borrowed from them and had given to Zada.

Moreover, as Tocco's Attorney Simjanovski recognized, Zada's counsel was bound by rules of professional responsibility that precluded him from disclosing his client's confidences to Tocco; that Zada's counsel had a fiduciary relationship with and owed a duty solely to his own client Zada, not to Tocco; and that Zada, as Tocco's debtor, had interests that were adverse or potentially adverse to those of his creditor Tocco. In fact, Attorney Simjanovski withdrew as Tocco's counsel in Fall 2008 because Tocco ignored his legal advice to either sue Zada or collect the Zada personal property secured by the 2007 UCC Financing Statement at that time. (Simjanovski Dep. at 27, 81-83, 96.)

Tocco presents no evidence here showing that Defendant Firm or Defendant Attorney were representing his interests rather than those of Zada. *See Prentis Family Found., Inc. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 906, 907 (Mich. Ct. App. 2005) (observing that "the placement of trust, confidence, and reliance must be reasonable, and placement is unreasonable if the interests of the client and nonclient are adverse or even potentially adverse."). Moreover, Michigan law does not allow Tocco to claim he was the third party beneficiary of Defendant Attorney's relationship with his client Zada. *See id.* at 907 (rejecting the plaintiff's argument that the law firm representing defendant cancer

46

center owed it an independent fiduciary duty and observing that the law firm's "relationship with the [cancer] center was one of agency, and agency agreements do not create rights in third parties.") (internal quotation marks and citations omitted). As the Michigan Supreme Court observed in *Beaty v. Hertzberg & Golden, P.C.*, 571 N.W.2d 716, 720 (Mich. 1997), "[t]here has been a reluctance to permit an attorney's actions affecting a nonclient to be a predicate to liability because of the potential for conflicts of interest that could seriously undermine counsel's duty of loyalty to the client." (Citations omitted). "[T]his Court has repeatedly declined to recognize a fiduciary obligation running to a potentially adverse party because such a duty would necessarily permeate all facets of the litigation and have a significantly deleterious effect on the attorney's ability to make decisions for the benefit of his client." *Id.* at 722 (internal quotation marks and citations omitted).

Second, as the record evidence shows, Plaintiff Tocco cannot show reasonable reliance on Defendant Attorney's alleged fraudulent misrepresentation that Zada's inheritance funds were presently in Defendants' client trust account in light of contemporaneous writings to the contrary. The Michigan courts have long recognized that a plaintiff cannot establish a reasonable reliance by relying "on oral representations that are contradicted by a written contract between the parties or otherwise conflict with a written document that is readily available to the plaintiff." *Chimko v. Shermeta*, No. 264845, 2006 WL 2060417, at *3 (Mich. Ct. App. July 25, 2006). *See also Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 568 n.4 (Mich. 2012) (observing that "[i]gnoring information that contradicts a misrepresentation is considerably different than failing to affirmatively and actively

47

investigate a representation."); *Aron Alan, LLC and Tranfran, Inc.*, 240 F. App'x 678, 682 (6th Cir. 2007) (applying Michigan law and observing that "[u]nreasonable reliance includes relying on an alleged misrepresentation that is expressly contradicted in a written contract that the plaintiff reviewed and signed.")

Tocco testified that before, during, and after the August 2008 in-person meeting, Defendant Attorney told him that Zada's inheritance money was in Defendants' client trust account or was being domesticated in a New York bank account that was under Defendant Firm's control.   (Tocco Dep. at 175-79, 181-82, 222-23.)   Tocco's attorney, Daniel Simjanovski, testified that Defendant Attorney did not state that the Zada inheritance funds were in his client trust account until after the August 14, 2008 in-person meeting. (Simjanovski Dep. at 32, 77, 81-82, 94-95.)   Tocco's attorney here, Mayer Morganroth, testified that Defendant Attorney made a similar statement in a phone conversation with him that took place in either late December 2008 or early January 2009.  (Morganroth Dep. at 19-22, 66.)  Each of these alleged oral representations, however, are contradicted by written documents that were addressed to Tocco or are contradicted by Tocco's conduct.[6] Specifically:

### Before and During August 14, 2008 In-Person Meeting

.   On March 28, 2008, in response to Tocco's request that Defendant Attorney prepare a letter for him to show to friends and/or family members that were pressuring Tocco for repayment, Defendant Attorney

---

[6]Plaintiff cannot establish reasonable reliance on letters Defendant Attorney sent to other individuals (Pl.'s Resp., Ex. 6, letters to individuals other than Tocco) absent evidence that Defendant Attorney provided the letters to Plaintiff Tocco with the intent that Tocco act on the representations in those letters and that Tocco did act in reliance on them to his detriment.  (Pl.'s Resp. at 18-19, 19 n.1.)  Plaintiff presents no such evidence here.

wrote to Tocco expressly stating that Zada was, at that time, "waiting on the European bank to which the funds are being transferred to finalize the paperwork that accepts the funds" (Defs.' Ex. 17, 3/21/08 email chain) (emphasis added);

. Tocco approved the letter and a final version was sent to Tocco on March 24, 2008 (Defs.' Ex. 18, 3/24/08 emailed letter; Whittles Dep. at 132-141);

. After April 21, 2008, Tocco loaned Zada approximately $857,000.00 based on Zada's representation that there was some type of fee he had to pay to get his inheritance expectancy (Tocco Dep. at 98-99, 113-115, 125-26, 174; Defs.' Ex. 13, Pl.'s Interrog. Ans. No. 2);

. On August 8, 2008, Defendant Attorney wrote to Tocco informing him that "the monies will be available for distribution on August 20, 2008," and that Defendants "plan to accept the funds on that date on his behalf," and that "[t]hese funds will be used" to immediately pay Mr. Zada's entire debt to Tocco (Defs.' Ex. 22, 8/8/08 letter) (emphasis added);

**Between August 14, 2008 In-Person Meeting and October 2008**

. Just 12 days after the August 14 in-person meeting, on August 26, 2008, text messages between Defendant Attorney and Tocco reveal Tocco asking "John, if the funds transferred, the funds should be in your trust account" (Defs.' Ex. 29, 8/26/08 text at 12:37 p.m.), "John, what's the status? Is funds in your account or not? Please reply?" (*id.*, 8/26/08 text at 3:07 p.m.), and Defendant Attorney's reply, "Not yet." (*id.*, 8/26/08 text at 3:42 p.m.) (emphasis added);

. Also on August 28, 2008, Defendant Attorney prepared an Affidavit at Tocco's request that provides, in pertinent part, that:

"We have been expecting a substantial payment on Mr. Zada's behalf, which payment would be more than sufficient to satisfy Mr. Zada's debt to Mr. Tocco. . . .  However, there have been delays in delivery outside of the control of myself, Mr. Zada and Mr. Tocco. I have been working diligently on behalf of Mr. Zada to expedite payment and will continue to do so. Although I am unable to guarantee an exact date or time of payment, we are expecting payment in a matter of days or less." (Defs.' Ex. 23, 8/28/08 Whittles Aff.)(emphasis added);

49

.   A little over a month later, in early October 2008, Defendant Attorney and Tocco exchanged text  messages where Tocco repeatedly asks if the Zada money has been deposited into Defendants' bank account and Defendant Attorney responds, "Just called bank here.  Not yet."  (Defs.' Ex. 29, 10/08 text messages; Whittles Dep. at 280-81).

.   On October 6, 2008, Defendant Attorney and Tocco exchanged emails. At 11:33 a.m., Tocco asks Defendant Attorney, "John, <u>are we still on target for the funds hitting your account tomorrow</u>?"  (Defs.' Ex. 24, 10/6/08 email chain), and Defendant Attorney's response that "We are absolutely <u>expecting confirmation and funds tomorrow</u>.  I will call you as soon as I hear from Joe.", and Tocco's reply, "Thanks John." (*id.*) (emphasis added);

.   On October 6, 2008, at Tocco's request, Defendant Attorney sent Tocco a letter, via email, regarding repayment from Joseph P. Zada and stating, "I have been advised that <u>I will have confirmation of a wire transfer tomorrow morning, Tuesday, October 7, 2008, and will be able to wire funds shortly thereafter</u>."  (Defs.' Ex. 27, 10/6/08 letter) (emphasis added);

.   On October 10, 2008, Defendant Attorney wrote a letter to Tocco, stating, "I think that, based on what we accomplished this week, the wrinkles have been ironed out and <u>I am expecting that funds will be sent to my trust account next week</u>, with which we will settle my client's business indebtedness to you." (Defs.' Ex. 30, 10/10/08 letter) (emphasis added);

.   Between October 10 and October 21, 2008, Tocco and Defendant Attorney exchanged text messages, with Tocco asking if Defendant Attorney has written confirmation that the Zada funds had been wired and Defendant Attorney responding that "I have no new information.  I will call you when I do."  (Defs.' Ex. 29, 10/08 texts; (Whittles Dep. at 290-93);

.   Around this time, Tocco's Attorney, Daniel Simjanovski, advised Tocco to sue Zada or at least get in a truck and drive down to Florida and pick up the personal property collateralized in the UCC filing that Simjanovski had prepared for Tocco in 2007 (Simjanovski Dep. at 81-83, 96);

.   On November 21, 2008, Tocco and Zada executed a document titled "Acknowledgment of Settlement and Mutual General Release (Joseph P.

Zada and Sam Anthony Tocco)" where Zada agreed to promptly pay Tocco $4,797,541.00 and Tocco agreed to release all claims he had against Zada (Defs.' Ex. 31);

. On December 17, 2008, Tocco emailed Defendant Attorney reminding him that, a few months earlier, he had prepared a letter to Tocco regarding the status of Zada's repayment to Tocco and asking for a similar letter.  Defendant Attorney agreed to do so.  (Whittles Dep. at 295-96; Tocco Dep. at 205-07);

. On December 23, 2008, Defendant Attorney wrote the requested letter and emailed it to Tocco.  In it, Defendant Attorney writes, in pertinent part, that:

> Mr. Zada apologizes for the delay in payment, which delay was caused by circumstances beyond his control.  Mr. Zada re-acknowledges his debt to you and <u>I am told that my trust account will be funded</u> to facilitate your payment <u>on or before January 5, 2009.  I will initiate a wire transfer to you immediately upon my receipt of funds and I will call you to confirm that transfer</u>."

(Defs.' Ex. 32, 12/23/08 letter) (emphasis added).

. Tocco admitted that, based on the language in this letter, Defendant Attorney clarified that he did not have the money in his client trust account (Tocco Dep. at 207-08, 214-15);

**After Late December 2008 or Early January 2009 Morganroth/Whittles Call**

. On January 5, 2009, Tocco apparently did not receive payment.

. Two months later, on March 4 and 5, 2009, Tocco and Zada execute "Payment, Release, Standstill and Confidentiality Agreement" and Attorney Morganroth executes Agreement as Escrow Agent and gist of Agreement is that if Zada does not pay Tocco $4,797,541.00 in 45 days after March 5, 2009, then a consent judgment held by the Escrow Agent will be entered in Wayne County Circuit Court against Zada for that amount (Defs.' Ex. 40);

51

.   On April 17, 2009, Zada sent Tocco a letter enclosing a check in the amount of $5 million with an attached memo stating, "Do not deposit the check or contact the bank without authority from me.  I will contact you with specific information regarding the time and the branch location." (Tocco Dep. at 210; Whittles Dep. at 311-312);

.   On April 20, 2009, although the 45 days had elapsed, Tocco did not deposit the Zada check or enter the Consent Judgment;

.   On July 28, 2009, Attorney Morganroth filed a complaint against Zada in Wayne County Circuit Court and had the Consent Judgment entered against Zada (Defs.' Ex. 41, 7/28/09 Consent Judgment);

.   Post entry of the Consent Judgment, other than gathering information, no effort is made to collect on that Consent Judgment (Morganroth Dep. at 39, 72-76);

.   In 2010, Zada filed for Chapter 7 bankruptcy in the Bankruptcy Court for the Southern District of Florida (Defs.' Ex. 4; Pl.'s Ex. O);

.   On January 4, 2011, Tocco filed this lawsuit against Defendant Attorney and Defendant Law Firm.

The evidence in this case refutes Plaintiff Tocco's claims that he delayed filing for bankruptcy, delayed suing Zada, or delayed efforts to collect the Zada personal property collateralized in the 2007 UCC Financing Statement because he reasonably relied on Defendant Attorney's misrepresentation that Zada's inheritance money was presently in Defendants' client trust account.

For the above-stated reasons, Defendant's motion is granted as to Plaintiff's claim of fraudulent misrepresentation.  The Court now considers Plaintiff's claims of negligent and innocent misrepresentation and silent fraud.

### B.  Plaintiff's Claim of Negligent Misrepresentation Fails

52

Plaintiff's claim of negligent misrepresentation also fails.  First, as Plaintiff Tocco acknowledged in his deposition, during Defendants' representation of Zada in connection with the Zada/Tocco debt at issue here, Defendants represented Zada, not Tocco.  (Tocco Dep. at 38, 79-80.)  Under Michigan law, "[a] claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care."  *Fejedelem v. Kasco*, 711 N.W.2d 436, 437 (Mich. Ct. App. 2006) (internal quotation marks and citations omitted).  Since, as discussed above, Plaintiff Tocco has not presented evidence that would support the essential element of reasonable reliance, his claim of negligent misrepresentation cannot survive Defendants' motion for summary judgment.  This claim also fails because Plaintiff cannot establish that Defendants owed Tocco a duty of care.

The Michigan Supreme Court has long recognized that an attorney does not owe a duty of care to his client's adversary.  It has clarified that, "creation of a duty in favor of an adversary of the attorney's client would create an unacceptable conflict of interest which would seriously hamper an attorney's effectiveness as counsel for this client.  Not only would the adversary's interests interfere with the client's interests, the attorney's justifiable concern with being sued for negligence would detrimentally interfere with the attorney-client relationship."  *Friedman v. Dozorc*, 312 N.W.2d 585, 591-92 (Mich. 1981).  Again, as discussed above, Plaintiff Tocco's interests were adverse to those of Defendants' client Zada.  This is illustrated by Defendant Attorney's advice to his client Zada to delay receipt of his inheritance expectancy in order to received a larger sum of money despite Plaintiff Tocco's adverse interest in having Zada accept immediate payment thus allowing Tocco

53

to avoid financial difficulties and to pay off his friends and family who were pressuring him for repayment.  Rejecting an argument similar to the one Plaintiff Tocco asserts here, the Michigan Supreme Court concluded "that the public policy of maintaining a vigorous adversary system outweighs the asserted advantages of finding a duty of due care to an attorney's legal opponent." *Id.* at 592.  *See also Prentis Family Found.,* 698 N.W.2d at 906 (concluding that the defendant law firm had a fiduciary duty to act on its client's behalf and not that of its client's adversary).  As the Michigan Supreme Court more recently observed:

> To claim breach of a fiduciary duty, there must be a situation in which the nonclient reasonably reposed faith, confidence, and trust in the attorneys' advice. As is apparent, it is unreasonable for a nonclient to repose confidence and trust in an attorney when any of the interests of the client and the nonclient are adverse.  Moreover, this Court has repeatedly declined to recognize a fiduciary obligation running to a potentially adverse party because such a duty would necessarily permeate all facets of the litigation and have a significantly deleterious effect on the attorney's ability to make decisions for the benefit of his client.

*Beaty*, 571 N.W.2d at 722-23 (internal citations omitted and internal quotation marks and citations omitted).  Plaintiff's tort-based negligent misrepresentation claim is dismissed because "there can be no tort liability unless defendants owed a duty to plaintiff," and Plaintiff cannot establish this essential element of his negligent misrepresentation claim. *Id.* at 723.

The Court now addresses Plaintiff's claim of innocent misrepresentation.

## C.  Plaintiff's Claim of Innocent Misrepresentation Fails

Plaintiff's claim of innocent misrepresentation cannot survive Defendants' motion for summary judgment.  As the Michigan Supreme Court recently observed, "[t]he doctrine of

54

innocent misrepresentation is also well settled in Michigan." *Titan Ins. Co.*, 817 N.W.2d at 556.  It also pointed out the distinctions between claims of fraudulent misrepresentation (or actionable fraud) and claims of innocent misrepresentation:

> On the one hand, the innocent misrepresentation rule differs in eliminating the *scienter* and proof of the intention that the misrepresentation be acted upon. However, on the other hand, the innocent misrepresentation rule <u>adds the requirements that the misrepresentation be made in connection with making a contract</u> and <u>the injury suffered by the victim must inure to the benefit of the misrepresenter.</u>

*Id.* at 556, n.5 (underscored emphasis added).  Under Michigan law, "the rule of innocent misrepresentation only applies to parties in privity of contract," and for that reason "the traditional requirement that the misrepresentation be made with the intention to induce the other party to act is automatically satisfied."  *United States Fid. & Guar. Co. v. Black*, 313 N.W.2d 77, 85 (Mich. 1981).  This is because "in situations involving privity of contract, all representations may be presumed to be made for the purpose of inducing the other party to enter the contract."  *Id.*

Plaintiff here presents no evidence that Defendant Attorney's alleged misrepresentations were made in connection with the making of a contract or that the injury Plaintiff Tocco suffered inured to Defendant Attorney's benefit.  First, "[s]ince the rule of innocent misrepresentation only applies to parties in privity of contract," and Plaintiff Tocco cannot show that he and Defendants were in privity of contract, Plaintiff cannot establish this essential element of his innocent misrepresentation claim.  *Id.  See also Riddle v. Lacey & Jones*, 351 N.W.2d 916, 919 (Mich. Ct. App. 1984) (rejecting claim of innocent misrepresentation asserted by widow of workers' compensation claimant against deceased

55

husband's employer's attorney who had negotiated a redemption contract between the widow and employer because "[a]s an agent for a disclosed principal, defendant cannot be held liable for his principal's failure to perform.").

Second, because Defendants are owed legal fees from their client Zada regardless of the outcome of their efforts to facilitate his receipt of his inheritance expectancy and payment of the debt Zada owed Tocco, Plaintiff cannot show that any injury he suffered, i.e., non-payment of money Zada owed him, inability to collect on collateralized Zada personal property, or inability to collect on his Consent Judgment against Zada, inured to Defendant Attorney's benefit.  *See Vora*, 2001 WL 1585046, at *8 (rejecting the plaintiff's argument "that defendant's receipt of legal fees while failing to disclose his commission of malpractice, constitutes a benefit to defendant inuring as a result of his innocent misrepresentation."); *Riddle*, 351 N.W.2d at 919    (Mich. Ct. App. 1984) (rejecting claim of innocent misrepresentation because "[t]he injury suffered by plaintiff was either the loss of her claim against [her husband's employer] or the loss of the $15,000 insurance benefit caused by the Teamster's Health and Welfare Fund's refusal to reinstate the life insurance policy.  In either event, the loss did not inure to the benefit of defendant [attorney], who received a fee for his services regardless of whether plaintiff ever got paid.").

The Court now addresses Plaintiff's claim of silent fraud.

### D.  Plaintiff's Claim of Silent Fraud Fails

Plaintiff's claim of silent fraud was not pled in his complaint but, at oral argument, Plaintiff confirmed his intent to pursue this claim as well.  This claim, like the rest of Plaintiff's fraud claims, cannot survive Defendants' motion for summary judgment.

56

Under Michigan law, "in order to prove a claim of silent fraud, a plaintiff must show that some type of representation that was false or misleading was made and that there was a legal or equitable duty of disclosure." *M & D, Inc. v. W.B McDonkey*, 585 N.W.2d 33, 39 (Mich. Ct. App. 1998). A claim of silent fraud "is essentially the same" as fraudulent misrepresentation "except that [silent fraud] is based on a defendant suppressing a material fact that he or she was legally obligated to disclose, rather than making an affirmative misrepresentation." *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich. Ct. App.), *lv. denied*, 812 N.W.2d 771 (Mich. 2012). "Mere silence is not enough to sustain a silent fraud cause of action. Instead, a plaintiff must establish that the defendant intentionally suppresse[d] material facts [in order] to create a false impression." *Vora*, 2001 WL 1585046 at *6 (internal quotation mark and citations omitted).

Despite the undisputed fact that numerous individuals, banks, and entities were apparently scammed by Zada, and despite Defendant Attorney's unrefuted testimony that he confirmed or verified Zada's representations and supporting documentation concerning his inheritance expectancy and whether and when that money would be available by speaking with Zada's other attorneys, his financial advisor in California, and his European and Middle Eastern representatives, Plaintiff Tocco argues that Defendant Attorney did not do enough -- that he should have done more to satisfy an obligation of due diligence that was owed to Tocco, his client's adversary. As discussed above, Defendant Attorney represented Zada, not Tocco, and owed no legal duty of disclosure of his client's confidences to his client's adversary. Likewise, there is no evidence in this case that would give rise to an equitable duty of disclosure that Defendant Attorney owed to Plaintiff Tocco.

57

The facts of this case, and the evidence presented here, are vastly different than those where the Michigan courts have found an equitable duty to disclose, i.e., in the buyer/seller context where a seller had knowledge of facts that he failed to disclose to the buyer and thus mislead the buyer about the condition of residential or commercial property. *See, e.g., M & D, Inc.*, 585 N.W.2d at 38 (citing cases).

Even if Defendant Attorney did owe a duty of disclosure to Plaintiff Tocco, Plaintiff's still cannot establish a claim of silent fraud. There is no evidence here that shows Defendant Attorney had knowledge of facts that he failed to disclose, and as the Michigan courts recognize, "[o]bviously, there is no duty to disclose what is not known." *Hammond v. Matthes*, 311 N.W.2d 357, 359 (Mich. Ct. App. 1981). There is no evidence that Defendant Attorney intentionally suppressed information that he had from Plaintiff Tocco in an effort to create the false impression that Zada was willing and able to repay his debt to Tocco. It is undisputed here that, during the course of his representation of Zada with regard to the repayment of Zada's debt to Tocco, Defendant Attorney believed the representations made to him by Zada and his representatives. Again, the crux of Plaintiff's claim is not that Defendant Attorney intentionally suppressed information that he had so as to mislead Tocco. Rather, Plaintiff Tocco complains that Defendant Attorney did not discover information or otherwise satisfy an obligation that he did not owe to Plaintiff, his client's adversary. For these reasons, Plaintiff Tocco's claim of silent fraud is dismissed.

## IV. Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.

58

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  December 17, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 17, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager